IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-20-02099-001-TUC-SHR (LCK) |
|---|---|
| Plaintiff, | **Order Re: Report and Recommendation** |
| v. | |
| Mario Pastor Buelna, | |
| Defendant. | |

    Pending before the Court is a Report and Recommendation ("R&R") (Doc. 92) issued by United States Magistrate Judge Lynette C. Kimmins recommending the Court grant Defendant's Motion to Suppress Pretrial Identification (Doc. 72). The Government has filed an Objection (Doc. 95). For the reasons that follow, the Government's Objections are well-taken and the Court will deny Defendant's Motion to Suppress.

**I.      Standard of Review**

    When reviewing a magistrate judge's R&R, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original). However, Objections to R&Rs "are not to be construed as a second opportunity to present the arguments already considered by the Magistrate Judge." *Betancourt v. Ace Ins. Co. of Puerto Rico*, 313 F. Supp. 2d 32, 34 (D.P.R. 2004); *see also Camardo v. Gen.*

*Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("The purpose of the Federal Magistrates Act is to relieve courts of unnecessary work" and "[t]here is no increase in efficiency, and much extra work, when a party attempts to relitigate every argument which it presented to the Magistrate Judge.").

## II.     Background

The Government does not object to, and this Court adopts, the following facts as set forth in the R&R:

> Adrian Martinez is a U.S. Border Patrol field agent with his main area of patrol in Douglas, Arizona. (RT at 5-6.)[1] Agent Martinez received training on tracking, processing, and other duties at the Federal Law Enforcement Training Center. (*Id.* at 6.)
>
> On May 22, 2020, at approximately 1:50 p.m., Agent Martinez was in his marked Border Patrol vehicle patrolling Geronimo Trail, a two-lane road approximately one half-mile from the International Border Fence (IBF) (*Id.* at 6, 8, 20.) Geronimo Trail is a somewhat maintained dirt and rocky road. Typically, this road is used by ranchers, not the public; however, during this time, there were construction vehicles and workers due to the building of the border wall. (*Id.* at 7.) Agent Martinez was notified by another agent that there was a white S-10 Chevrolet small pick-up truck parked near the IBF in a location that was not designated for construction vehicles. (*Id.* at 7-8.) Finding a vehicle so close to the IBF was unusual because the construction workers were specifically told not to park next to the fence. (*Id.*)
>
> At approximately 2:45 p.m., Border Patrol horse units advised that the white S-10 truck was driving westbound on Geronimo Trail towards Douglas. (*Id.* at 8.) Agent Martinez was near mile marker 12, facing eastbound on Geronimo Trail as the S-10 truck passed him. Agent Martinez admitted that, as the driver passed, he did not have a good enough look to describe or identify the driver. (*Id.* at 21.) The agent made a U-turn in an attempt to get behind the S-10 truck. By the time he turned, the S-10 truck had increased its speed to approximately 50 miles per hour. (*Id.* at 9.)
>
> At approximately mile marker 9.5, the S-10 truck

---

[1]"RT" refers to the Reporter's Transcript of the October 4, 2021 evidentiary hearing. (Doc. 91.)

slowed down, which allowed Agent Martinez to catch up. (*Id.* at 9-10.) At mile marker 9.1, another Border Patrol vehicle became visible on the road ahead. (*Id.* at 10.) At that location, the S-10 truck took a sharp left-hand turn onto a road traveling south towards the IBF. (*Id.* at 10.) The S-10 truck was a little less than half a mile from the border traveling at speeds of 50-55 miles per hour, which Agent Martinez indicated was excessive because the road was dirt and not maintained, with a lot of dips and humps. (*Id.* at 11, 23.) Agent Martinez continued to pursue the S-10 truck but backed off a little due to his concern for construction workers in the area. (*Id.* at 11-12, 22.) At the end of the road, the S-10 truck took another left-hand turn, doubling back, now traveling at approximately 70 miles per hour on a straight-away part of the road that paralleled the IBF. This pursuit continued to approximately mile marker 13. The IBF in this area consisted of various gaps or spaces large enough for a vehicle to pass through. (*Id.* at 11-12, 22-23.) The S-10 truck started to slow down to approximately 35 miles per hour near a large wash where there was no fencing, and it eventually stopped near the IBF between a gap and the start of the fence. Agent Martinez stopped directly behind the S-10 truck. (*Id.* at 12, 24.)

      The driver of the S-10 truck opened his door and proceeded on foot towards Mexico. As the driver left the truck, he directed his eyesight towards the agent. Agent Martinez did not follow the driver because he was so close to Mexico. Agent Martinez indicated he was approximately a half-car length from the driver and was able to see him for no more than 10-15 seconds. (*Id.* at 13.) Agent Martinez clarified that, at the beginning of his 10-15 seconds of viewing time, he was in his vehicle but proceeded to get out of his vehicle, staying near the door frame; the driver was briskly walking towards Mexico while periodically looking back. (*Id.* at 13, 24-25, 31.) Agent Martinez testified that he had a "pretty good view of the driver" until he went into the desert brush. (*Id.* at 14.) The agent admitted that the driver was not staring directly at him for any extended amount of time, and he did not have a very long visual as the brush and trees obscured his view. His only good visual of the driver was the 10-15 seconds from when he stopped the vehicle, got out, and walked briskly to the IBF before reaching the obstructing brush. (*Id.* at 14, 26.) The only features Agent Martinez described were that the driver was not very tall, not skinny, of above-average build,

and had a noticeable goatee. (*Id.* at 14-15, 26.) Agent Martinez admits that he could not provide any other physical descriptors of the driver, such as hair or eye color, and that the goatee was the only somewhat distinguishable trait. (*Id.* at 29.)

After the driver absconded, Agent Martinez secured the S-10 truck and went to the station to process the marijuana found in the truck and to write his narrative report. (*Id.* at 15.) During this time, Agent Martinez was able to determine that the registered owner of the S-10 truck was Defendant Mario Buelna. While Agent Martinez was writing his report, an individual from the Border Patrol intel department brought over a single photograph and asked Agent Martinez if it was the driver of the S-10 truck. (*Id.* at 15, 28, 31; Exhibit 1.) Agent Martinez believed it was most likely a driver's license picture. (*Id.* at 15.) He identified the individual in the photo as the driver of the S-10 truck that he saw abscond into Mexico. At the hearing, Agent Martinez verified that the photo was from the driver's license of the registered owner of the vehicle, Defendant Buelna. (*Id.* at 16.) Agent Martinez did not include a detailed description of the driver in his notes or report. (*Id.* at 27.)

The following day, on May 23, 2020, Agent Martinez was notified that Defendant Buelna, the registered owner of the S-10 truck, had been detained at the Port of Entry and taken to the Douglas Border Patrol station for an interview. (*Id.* at 16.) Agent Martinez went to the station and saw Defendant, who was being held alone in an isolation cell. The agent, again, identified Defendant Buelna as the individual he saw abscond into Mexico the previous day. (*Id.* at 16-17, 29, 31.)[2]

On October 4, 2021, Magistrate Judge Kimmins held a hearing on the Motion to Suppress Pretrial Identification. (Doc. 83.) Following the hearing, Magistrate Judge Kimmins concluded the identification procedure used was unnecessarily suggestive and, after considering the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 201 (1972), concluded that, based on the totality of the circumstances, the unnecessarily suggestive identification procedure created a substantial likelihood of irreparable misidentification.[3] (Doc. 92.)

---

[2]Agent Martinez also made an in-court identification of Defendant Buelna during the evidentiary hearing. (RT at 17.)

[3]Courts use "impermissibly," "unnecessarily," and "unduly" suggestive interchangeably. All of these terms "reinforce our focus not on the act of suggestion, but

### III. Discussion

As noted, the Government does not object to the factual findings in the R&R, but objects to the Magistrate Judge's legal findings. (Doc. 95 at 1.) Specifically, the Government argues the identification procedure used was not impermissibly suggestive. The Government further asserts that even if the procedure was impermissibly suggestive, the identification was nonetheless reliable and therefore should not be suppressed.

As explained by the Magistrate Judge, an identification procedure is suggestive when it "emphasize[s] the focus upon a single individual." *U.S. v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998). However, "a suggestive pretrial identification procedure does not violate due process when use of the procedure is 'imperative.'" *Id.* (citing *Stovall v. Denno*, 388 U.S.293, 301–02 (1967)). The Ninth Circuit has read *Stovall* to mean "that an identification procedure is unnecessarily suggestive when its use is not imperative." *Id.* In *Montgomery*, the Ninth Circuit concluded that showing a witness only one photograph when asking him to identify the suspect was unnecessarily suggestive because the record was "devoid of any indication" that the suggestive identification procedure was imperative, the initial photo identification by the witness occurred one year after the crime, the government had "ample time to prepare a non-suggestive photographic array," and the photo and subsequent in-court identifications "were not compelled by any exigent circumstances." *Id.* Accordingly, the Ninth Circuit concluded the identification procedure was unnecessarily suggestive and went on to consider whether the witness's subsequent in-court identification was sufficiently reliable under the totality of the circumstances. *Id.*

As in *Montgomery*, the witness here—Agent Martinez, was shown only one photo of the suspect and identified the defendant as the person in the photo. Also like *Montgomery*, there is nothing in the record suggesting this identification procedure was imperative. Although the photo identification here took place on the same day as the offense, nothing in the record suggests the identification was compelled by exigent

---

on whether the suggestiveness rises to such a level that it undermines reliability." *Perry v. New Hampshire*, 565 U.S. 228, 254 n.3 (2012).

circumstances. Therefore, based on the Ninth Circuit's reading of *Stovall* and its analysis in *Montgomery*, the Court concludes the identification procedure used here was unnecessarily suggestive.

However, even when police use an unnecessarily suggestive identification procedure, "suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012); *see also Montgomery*, 150 F.3d at 993; *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985) ("Should we find a pretrial procedure impermissibly suggestive, automatic exclusion of identification testimony is not required."). Rather, due process requires courts to "assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S at 239. Because "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), the question is whether, under the totality of the circumstances, the identification was reliable despite the suggestive procedure, *Biggers*, 409 U.S. at 199. In evaluating the likelihood of misidentification, courts consider the following factors:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200. "Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 116). "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.*

Having concluded the identification procedure used here was unnecessarily suggestive, the Court now applies the *Biggers* factors and weighs the facts against the corrupting effect of the suggestive procedure. Here, Agent Martinez viewed the suspect for 10 to 15 seconds from half a car's length away, in broad daylight. (RT p. 13.) Agent Martinez testified he "had a pretty good view" of the suspect as he watched him exit his

truck and "brisk[ly]" walk towards the international border, and his view was unobstructed until the suspect moved behind brush. (*Id.* at 14.) During this 10–15 seconds, the suspect looked back and forward repeatedly, and Agent Martinez testified the suspect "[m]ost of the time was looking back," although he was not starting directly at Agent Martinez. (*Id.* at 25–26.) Although Agent Martinez exited his vehicle while he was watching the suspect, there is no indication from the record that doing so diverted or hindered his attention in watching the suspect. Agent Martinez did not provide a detailed description of the suspect in his report because when he had returned to the station and was writing his report, another agent showed him what appeared to be a driver's license photo of the registered owner of the truck, who Agent Martinez identified as the suspect. (RT pp. 15, 27.) Nonetheless, Agent Martinez demonstrated certainty about Defendant's identification at the hearing held before the Magistrate Judge. Finally, the photo identification occurred at most a few hours after the crime, and the in-person identification at the Douglas Border Patrol station occurred the day after the crime.

Based on the totality of the circumstances, the Court concludes the *Biggers* factors here weigh in favor of a reliable identification and are not outweighed by any corrupting effect of the suggestive identification procedure.

Accordingly,

**IT IS ORDERED** the Magistrate Judge's Report and Recommendation (Doc. 92) is **adopted in-part** and **rejected in-part**.

**IT IS FURTHER ORDERED** Defendant's Motion to Suppress Pretrial Identification (Doc. 72) is **denied**.

Dated this 2nd day of December, 2021.

Honorable Scott H. Rash
United States District Judge